DECISION
{¶ 1} Relator, Abdikarim Hassan, commenced this original action requesting a writ of mandamus that orders respondent Industrial Commission of Ohio to vacate its order denying him temporary total disability benefits beginning June 20, 2001, on grounds that he voluntarily abandoned his former position of employment, and to enter an order granting said compensation.
{¶ 2} Pursuant to Civ.R. 53 and Section (M), Loc.R. 12 of the Tenth Appellate District, this matter was referred to a magistrate who issued a decision, including findings of fact and conclusions of law. (Attached as Appendix A.) In her decision, the magistrate concluded that pursuant to State ex rel. Louisiana-Pacific Corp. v. Indus. Comm. (1995),72 Ohio St.3d 401, the commission did not abuse its discretion in determining relator was not entitled to temporary total disability benefits, as relator had voluntarily abandoned his employment when he was fired for violation a written work rule. Accordingly, the magistrate determined the requested writ should be denied.
{¶ 3} Relator has filed objections to the magistrate's decision, asserting the magistrate erred in concluding that State ex rel. Baker v. Indus. Comm. (2000), 89 Ohio St.3d 376, does not apply to all cases of voluntary abandonment. More particularly, relator asserts the magistrate erred in creating a distinction between voluntary abandonment pursuant to an employee resigning from employment, and employment lost because an employee was fired.
{¶ 4} Subsequent to the magistrate's decision, relator's objections, and the responses of respondents Industrial Commission and Marsh Building Products, Incorporated ("Marsh"), the Ohio Supreme Court decided State ex rel. McCoy v. Dedicated Transport, Inc., 97 Ohio St.3d 25,2002-Ohio-5305. In McCoy, the court addressed the very issue presented in this case, and concluded that a "claimant who voluntarily abandoned his or her former position of employment or who was fired under circumstances that amount to a voluntary abandonment of the former position will be eligible to receive temporary total disability compensation pursuant to R.C. 4123.56 if he or she reenters the work force and, due to the original industrial injury, becomes temporarily and totally disabled while working at his or her new job." Id. at syllabus.
{¶ 5} As the Supreme Court explained, Baker held that a claimant who is medically released to return to work following an industrial injury but leaves his or her former position of employment to accept another position of employment is eligible to receive temporary total disability compensation under R.C. 4123.56(A) should the claimant re-aggravate the original industrial injury while working at his or her new job. Baker, at syllabus. The court, however, acknowledged that the holding of Baker did not directly apply to a situation in which the claimant was justifiably fired from his or former position of employment and then, after a period of unemployment, secured other work. Nonetheless, the court concluded "Baker's core rationale compels us to now extend its holding to encompass this situation." Id. at ¶ 27.
{¶ 6} Looking at the facts before it, the court determined that claimant McCoy voluntarily abandoned his former position of employment by virtue of being justifiably fired. Because, however, no evidence suggested that McCoy was gainfully employed at the times for which he sought temporary total disability compensation, the court concluded he was not eligible to receive such compensation for the periods in question. In the case of claimant Brandgard, the court also noted he voluntarily abandoned his former position of employment when he was justifiably fired after testing positive for cocaine. Because, again, no evidence in the record suggested Brandgard was actually employed at his new job on the dates for which he sought temporary total disability compensation, the court denied the request.
{¶ 7} Here, as the magistrate's decision notes, relator was terminated because he violated a written work rule that prohibited his absence from work for three consecutive days. More specifically, following a dispute at work, relator left work on May 31, 2001, and did not return. Three days later, Marsh terminated his employment. In July 2001, relator began working with Airborne Express, where he worked 51 hours over the course of three weeks in July.
{¶ 8} To the extent relator seeks to recover temporary total disability compensation for June 2001, the writ is denied. Relator presented no evidence of gainful employment for that period of time. Nevertheless, relator presented evidence that he was gainfully employed in July 2001 and, accordingly, we do not deny the temporary total disability compensation for lack of gainful employment. Instead, given the evidence indicating relator was gainfully employed in July 2001, we return the matter to the Industrial Commission to determine whether, as a result of his injury with Marsh, relator became temporarily and totally disabled while working at his new job. Relator's objections are sustained in part and overruled in part.
{¶ 9} Following independent review pursuant to Civ.R. 53, we find the magistrate has properly determined the pertinent facts. Accordingly, we adopt the magistrate's findings of fact as our own. We reject the magistrate's conclusions of law and, consistent with McCoy, issue a writ of mandamus ordering the Industrial Commission to vacate in part its order denying relator temporary total disability compensation on the grounds he voluntarily abandoned his former position of employment, and to determine whether he is entitled to temporary total disability compensation from the point he began working at his new job.
Objections sustained in part and overruled in part; writ granted in part and denied in part.
DESHLER and KLATT, JJ., concur.
 APPENDIX A IN MANDAMUS
{¶ 9} In this original action, relator, Abdikarim Hassan, requests a writ of mandamus ordering respondent Industrial Commission of Ohio ("commission") to vacate its order denying him temporary total disability ("TTD") compensation beginning June 20, 2001, on grounds that he voluntarily abandoned his former position of employment, and to enter an order granting said compensation.
Findings of Fact:
{¶ 10} 1. On May 21, 2001, relator sustained an industrial injury while employed as a laborer for respondent Marsh Building Products, Incorporated ("Marsh"), a state-fund employer. The industrial claim is allowed for "sprain of neck; sprain lumbar region; sprain of ankle, right," and is assigned claim number 01-378637.
{¶ 11} 2. On May 18, 2001, relator signed a receipt indicating that he had received the Marsh employee handbook and acknowledging that it was his responsibility to read the handbook. The handbook sets forth Marsh's policy on employee work attendance:
{¶ 12} "Absence or tardiness places the burden on others to do additional work regardless of the work performed. On the other hand, good attendance and ability to get to work on time are positive considerations when it comes time to review overall contributions to our work and our mission. Because regular attendance and punctuality are important to all of us, records of attendance are monitored.
{¶ 13} "* * *
{¶ 14} "Our policy on absence and tardiness has been set up to achieve a reasonable balance between our employees' need to have reliable attendance and punctuality, and our desire to protect the individual members of our work force in case of serious illness or personal emergency. Attendance records are always given serious consideration in evaluating the employee's overall effort in helping the company meet its goals. An absence of three (3) or more days requires medical certification. Should no medical certification be provided, the employee is subject to disciplinary action up to and including discharge. Absence without call-in will be managed on a case-by-case basis, but after three (3) consecutive days of no call-no show termination of employment will occur, recorded as `quit without notice.' "
{¶ 15} 3. On May 21, 2001, relator reported his injury to Marsh at 10:00 a.m. He refused treatment and worked until 4:58 p.m. He worked a full day on May 22, 2001.
{¶ 16} 4. Relator did not report to work on May 23, 24, and 25, 2001.
{¶ 17} 5. On May 29, 2001, relator reported to work with a note from Doctors Hospital Emergency Department excusing him from work on May 23, 2001 and May 24, 2001.
{¶ 18} 6. On May 30, 2001, relator worked a full day at Marsh.
{¶ 19} 7. On May 31, 2001, relator reported to work but clocked out at 11:08 a.m. without notifying his supervisor. After relator failed to call in or report for work on the next three-scheduled work days, Marsh marked "terminated" on relator's time card. No letter was sent to relator informing him of his termination.
{¶ 20} 8. According to the affidavit of Marsh's operations manager, Earl Tolliver:
{¶ 21} "On May 31, 2001, Maurice Black told me there was a problem with Abdikarim Hassan refusing to do his job. I went back to the warehouse where everyone started to argue. I told everyone to be quiet and that if they were not willing to pull their weight, they could get out.
{¶ 22} "A short time later, I learned that Abdikarim Hassan had clocked out and left with his friend Malik. After three days, when Abdikarim Hassan did not return to work or call in, he was terminated for violating the Company's `no call, no show' policy."
{¶ 23} 9. According to the affidavit of relator's former coworker, Maurice Black:
{¶ 24} "On May 31, 2001, I asked Abdikarim Hassan to help me unload some windows from a truck. He refused to do so and he cursed at me. I called Earl Tolliver who told everyone there to do their job and if they did not like it, they could leave.
{¶ 25} "A short time later, Abdikarim Hassan walked away with his friend Malik. I thought they were going to the break room but I later learned that they drove away."
{¶ 26} 10. According to relator's affidavit:
{¶ 27} "I left my job at Marsh Building Products before I was terminated by the company. I had no intention of returning to Marsh Building Products after leaving work on May 31, 2001. However, at no time did I intend to leave the entire work force.
{¶ 28} "* * *
{¶ 29} "Due to financial hardship, I obtained a new job at Airborne Express through a temporary service called Snider-Blake. I worked approximately fifty one hours over the course of three weeks in July * * *."
{¶ 30} 11. On a C-84 dated July 20, 2001, relator's treating chiropractor, Bernard J. Miller, Jr., DC, certified TTD from June 20, 2001 to an estimated return-to-work date of September 21, 2001.
{¶ 31} 12. Following an October 4, 2001 hearing, a district hearing officer ("DHO") issued an order denying relator's request for TTD compensation on grounds that relator had voluntarily abandoned his former position of employment. Relator administratively appealed.
{¶ 32} 13. Following a December 10, 2001 hearing, a staff hearing officer ("SHO") issued an order denying TTD compensation. The SHO's order states:
{¶ 33} "* * * It is the finding of the Staff Hearing Officer that the claimant was terminated for violation of a work rule or policy that was clearly defined prohibited conduct, had previously been identified by the employer as a dischargeable offense, and was known or should have been known to the employee. Therefore, consistent with State ex rel. Louisiana-Pacific Corp. V. Industrial Commission (1995), 72 Ohio St.3d 401,650 N.E.2d 469, temporary total compensation is denied.
{¶ 34} "The uncontroverted facts are as follows: On 05/21/01 the claimant sustained an industrial injury. He sought treatment on 05/23/2001, and he was given a slip to be off work for two days. The claimant returned to work on 05/29/2001. On 05/31/2001, for whatever reason, the claimant left work during his shift, never to return to work with this employer. The claimant did not tell the employer at that time, or at anytime thereafter, that he quit.
{¶ 35} "Per the employer, after the claimant failed to call in or show up for work on the next three work days, he was terminated. No letter was sent to the claimant, his time card was simply marked `terminated.' The employer testified at hearing that letters of termination are never sent as they are a high-volume employer of temporary help and terminations are common.
{¶ 36} "Claimant's counsel argues that consistent with the holding in State ex rel. Baker v. Industrial Commission (2000), 89 Ohio Stated [sic] 3d 376, as the claimant did not voluntarily abandon employment, he is not barred from the receipt of temporary total compensation. Counsel noted that the claimant obtained new employment in 07/2001, which demonstrates the claimant did not abandon the work force. Counsel concludes that under Baker, the claimant is not barred from receiving temporary total compensation as the claimant never intended to abandon the work force.
{¶ 37} "Employer's counsel argues that the claimant never informed the employer that he quit on 05/31/2001. It was not until after a three-day period of no call/no show that the employer found the claimant had voluntarily quit and his time card was marked `terminated.' The employer submitted copies of the written policy in regard to call-ins. The policy clearly states after (3) consecutive days of no call/no show, termination of employment will occur. The claimant signed a statement acknowledging receipt of the handbook on 05/18/2001. Employer's counsel argues that Louisiana Pacific is applicable as the claimant was terminated for violation of a written work rule, which constitutes voluntary abandonment and serves as a bar to the receipt of temporary total compensation.
{¶ 38} "The Staff Hearing Officer finds that both Baker and Louisiana-Pacific are good law. Therefore, this application for temporary total compensation must turn on a strict interpretation and application of the facts.
{¶ 39} "The Staff Hearing Officer finds that this application specifically turns on the factual finding of whether the claimant quit or was fired. On May 31, 2001, the claimant walked off the job with no explanation to the employer. On June 1, 2001, the claimant failed to call-in or show up for work. As a consequence, the claimant trigge[re]d the no call in or show provision of his work rules. The employer testified at hearing that the claimant was still considered to be an employee and could have worked had he returned on June 1. On June 2 and June 3, the claimant again failed to call-in satisfying the `quit without notice' standard set forth in the written work policy. The Staff Hearing Officer finds, based upon the above facts, that the claimant was terminated based upon written work rules that clearly state he would be terminated if he violated the rules and, by his signature of 05/18/2001, the results of which he was aware. Therefore, Louisiana-Pacific is applicable.
{¶ 40} "The Staff Hearing Officer further finds that in this case the claimant's reason for leaving the job on 05/31/2001 is not relevant, nor is his intent to re-enter the work force, since the claimant failed to inform the employer that he quit. As in Louisiana-Pacific, the claimant's inaction resulted in termination. In that case, the claimant was terminated for violating a no call/no show work rule. Had the claimant in this case informed the employer he had quit, the no call/no show provision could not have been applied. However, the claimant's failure to inform the employer that he quit triggered the work rule and results in a bar of temporary total compensation consistent with Louisiana-Pacific."
{¶ 41} 14. On January 16, 2002, relator, Abdikarim Hassan, filed this mandamus action.
Conclusions of Law:
{¶ 42} Relator contends that, in finding a voluntary abandonment of employment, the commission abused its discretion: (1) by failing to consider that relator intended to resign his employment at Marsh on May 31, 2001; (2) by imposing the burden on relator to disprove an element of the voluntary abandonment defense; and (3) by failing to find that he did not abandon the entire workforce, and on that basis, find that TTD is not precluded by termination of employment at Marsh.
{¶ 43} Finding no abuse of discretion, it is the magistrate's decision that this court deny relator's request for a writ of mandamus, as more fully explained below.
{¶ 44} Historically, this court first held that, where the employee has taken action that would preclude his returning to his former position of employment, even if he were able to do so, he is not entitled to continued TTD benefits since it is his own action, rather than the industrial injury, which prevents his returning to his former position of employment. State ex rel. Jones Laughlin Steel Corp. v. Indus. Comm. (1985), 29 Ohio App.3d 145. The Jones Laughlin rationale was adopted by the Supreme Court of Ohio in State ex rel. Ashcraft v. Indus. Comm. (1987), 34 Ohio St.3d 42, wherein the court recognized a "two-part test" to determine whether an injury qualified for TTD compensation. Ashcraft, at 44. The first part of the test focuses upon the disabling aspects of the injury whereas the latter part determines if there are any other factors, other than the injury, which prevent the claimant from returning to his former position of employment. Id. Thus, the Ashcraft court held that a claimant's incarceration precluded receipt of TTD compensation because, when a person chooses to violate the law, he is presumed to tacitly accept the consequences of his voluntary acts.
{¶ 45} In State ex rel. Rockwell Internatl. v. Indus. Comm. (1988), 40 Ohio St.3d 44, the court held that an injury-induced abandonment of the former position of employment, as in taking a retirement, is not considered to be voluntary.
{¶ 46} In State ex rel. Diversitech Gen. Plastic Film Div. v. Indus. Comm. (1989), 45 Ohio St.3d 381, 383, the court held that a claimant's acceptance of a light duty job did not constitute an abandonment of his former position of employment. The Diversitech Gen. court stated:
{¶ 47} "* * * The question of abandonment is `primarily * * * [one] of intent * * * [that] may be inferred from words spoken, acts done, and other objective facts. * * * All relevant circumstances existing at the time of the alleged abandonment should be considered.' * * *"
{¶ 48} In State ex rel. Louisiana-Pacific Corp. v. Indus. Comm. (1995), 72 Ohio St.3d 401, 403, the claimant was fired for violating the employer's policy prohibiting three consecutive unexcused absences. The court held that the claimant's discharge was voluntary, stating:
{¶ 49} "* * * [W]e find it difficult to characterize as `involuntary' a termination generated by the claimant's violation of a written work rule or policy that (1) clearly defined the prohibited conduct, (2) had been previously identified by the employer as a dischargeable offense, and (3) was known or should have been known to the employee. Defining such an employment separation as voluntary comports with Ashcraft and Watts [State ex rel. Watts v. Schottenstein Stores Corp. (1993), 68 Ohio St.3d 118] — i.e., that an employee must be presumed to intend the consequences of his or her voluntary acts."
{¶ 50} The Louisiana-Pacific rationale was applied to preclude TTD compensation where a claimant was fired by his employer for violating his employer's written drug abuse policy. State ex rel. Cobb v. Indus. Comm. (2000), 88 Ohio St.3d 54. The Louisiana-Pacific rationale was clarified as recently as last year. State ex rel. McKnabb v. Indus. Comm. (2001),92 Ohio St.3d 559.
{¶ 51} In August 2000, one year prior to McKnabb, the Supreme Court of Ohio issued its decision in State ex rel. Baker v. Indus. Comm. (2000), 89 Ohio St.3d 376, the syllabus of which states:
{¶ 52} "When a claimant who is medically released to return to work following an industrial injury leaves his or her former position of employment to accept another position of employment, the claimant is eligible to receive temporary total disability compensation pursuant to R.C. 4123.56(A) should the claimant reaggravate the original industrial injury while working at his or her new job."
{¶ 53} The Baker court briefly addressed the Louisiana-Pacific and Cobb cases without overruling them.
{¶ 54} The Baker court explained its decision, in part, by stating:
{¶ 55} "Today's decision does nothing more than recognize the job mobility of today's labor market. No citation of authority is needed to acknowledge the obvious that any number of people, different from day to day, are moving to other jobs for their same employer, or to different jobs for different employers. * * *" Id. at 384.
{¶ 56} Subsequent cases have expanded Baker. In State ex rel. Schack v. Indus. Comm. (2001), 93 Ohio St.3d 247, 248, the court dispensed with the Baker court's suggestion that the claimant must have specifically left his former position of employment to accept another position of employment. The Schack court stated:
{¶ 57} "All agree that claimant did not depart because he had a better job waiting in the wings. He left pursuant to a negotiated settlement agreement. The commission asserts that because other employment did not motivate claimant to quit, Baker does not apply. Claimant contends that so long as his decision to leave his former position of employment was followed by another job — as opposed to abandonment of the entire labor market — Baker controls.
{¶ 58} "We agree with claimant. Baker returns the focus of analysis to the disabling effects of a claimant's injury rather than upon — as it has been over the last several years — a claimant's decision to leave the job at which he or she was injured. This is consistent with the purpose of the workers' compensation system — to compensate employees for the disability incurred by workplace injury."
{¶ 59} A result similar to Schack was reached in State ex rel. Wagers v. Indus. Comm. (2001), 93 Ohio St.3d 218.
{¶ 60} In short, as the commission here correctly held, the Louisiana-Pacific line of cases and the Baker line of cases remain good law notwithstanding relator's contention to the contrary.
{¶ 61} Here, the commission held that the determination of which line of cases controls turned upon the factual determination of whether relator quit or was fired. The commission determined that relator did not quit on May 31, 2001, when he walked off the job with no explanation to his employer. The commission relied in part upon the employer's testimony that relator was still considered to be an employee and could have worked had he returned to Marsh on June 1, 2001. The commission's determination that relator did not quit his job on May 31, 2001, is supported by some evidence upon which the commission relied and the determination is sufficiently explained by the commission.
{¶ 62} Turning to the first issue, relying upon Diversitech, relator contends that it was his clear intention to resign his position with Marsh on May 31, 2001, and that the commission abused its discretion in failing to find this "intent" to be controlling.
{¶ 63} To begin, Diversitech does not fit into the Louisiana-Pacific line of cases. The Louisiana-Pacific line of cases are premised upon the rationale that ordinarily an employee who is fired for violation of a written work rule is presumed to intend the consequences of his voluntary acts. Thus, an intent to abandon employment is pre-sumed from the employee's violation of a written work rule when the employee should have known that the violation could result in termination of employment.
{¶ 64} Here, because relator violated Marsh's written work rule regarding unexcused absences, relator's intent to abandon his employment is presumed from the violation. Moreover, because relator failed to notify his employer of his intentions, the employer was entitled to treat relator as an employee subject to discipline for violation of a written work rule.
{¶ 65} Turning to the second issue, relator correctly notes that it was Marsh's burden to prove the voluntary abandonment. State ex rel. Quarto Mining Co. v. Foreman (1997), 79 Ohio St.3d 78, 83-84.
{¶ 66} Relator seems to argue that requiring him to notify his employer that he was quitting in order to avoid the consequences of being fired for unexcused absences, somehow places the burden of proof upon him. (Relator's brief at 12.) While it may be said that relator had a duty (or burden) to notify his employer that he was quitting, such is not a burden of proof.
{¶ 67} The record here fails to show that the commission abused its discretion on the burden of proof. Marsh met its burden of proof and thus the commission found that a voluntary abandonment of employment precluded TTD compensation.
{¶ 68} The third issue is whether the commission should have found that relator did not abandon the entire workforce, and on that basis, find that TTD is not precluded by termination of employment at Marsh. This is in effect an argument that the Baker line of cases are controlling. Clearly, the Louisiana-Pacific line of cases are controlling. Under Louisiana-Pacific, when a claimant is fired for violation of a written rule he is precluded from further TTD compensation regardless of any intention to remain in the job market. Here, relator attempts to apply the Baker rationale recognizing the mobility of the modern job market to his circumstance in departing employment at Marsh. The Baker rationale is inapplicable to relator's circumstance. If relator wanted to quit his job at Marsh to obtain a better job elsewhere all he had to do was inform Marsh that he was quitting so that Marsh, in keeping with its policy, could effectively plan its work schedule.
{¶ 69} Accordingly, for all the above reasons, it is the magistrate's decision that this court deny relator's request for a writ of mandamus.